## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| LILIAN ALESSA | ) | |
| 1795 Amy Court | ) | |
| Moscow, ID 83843 | ) | |
| | ) | |
| Plaintiff, | ) | Case No.:  1:20-cv-01320 |
| v. | ) | |
| | ) | |
| JAMES E. MCPHERSON, | ) | |
| in his official capacity as | ) | |
| Acting Secretary of the Navy, | ) | |
| DEPARTMENT OF NAVY | ) | |
| Office of the Secretary of the Navy | ) | JURY TRIAL DEMANDED |
| 1000 Navy Pentagon, Room 4D652 | ) | |
| Washington, D.C. 20350-1200 | ) | |
| | ) | |
| And | ) | |
| | ) | |
| TODD R. BOONE | ) | |
| 900 N Stuart St. #1012 | ) | |
| Arlington, VA 22203 | ) | |
| | ) | |
| And | ) | |
| | ) | |
| EDWARD A. WESTFALL | ) | |
| 3133 Connecticut Ave NW #832 | ) | |
| Washington, DC 20008 | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## COMPLAINT

### SUMMARY

1.      This action arises out of the sexist, archaic and harassing treatment of an internationally recognized female national security expert, who found herself subjected to the whims of Navy personnel who felt women should not be in the federal workplace, and if they were, they needed the protection of men, who apparently compelled by their own fundamentalist beliefs, felt an obligation to first limit and control Dr. Alessa's behavior, and when she resisted those

1

attempts, terminate her for her assertion of her rights.

2.      Dr. Lilian Alessa ("Dr. Alessa" or "Plaintiff") is a President's Professor at the University of Idaho and an "exquisite expert" in Resilience Science and Systems Science, which use data analysis to forecast and address national security concerns.  Dr. Alessa has a long and distinguished career both as a professor and in working with U.S. civil, military and national intelligence agencies.

3.      On June 7, 2018, Dr. Alessa was hired by the Department of the Navy ("Navy" or "Agency") to serve as an expert on developing a system to analyze complex data to identify potential national security threats.

4.      Although Dr. Alessa brought her expertise and zeal to the project and attempted to fulfill her mandate and by all reasonable metrics did so, she was thwarted in her efforts by men who perceived her gender as an intolerable condition to the workplace. They isolated her, segregated her, demeaned her, restricted her duties and performance capabilities, spread vicious rumors about her, including of a sexual nature, and justified their conduct under a religious inspired rubric of the need to "protect" Dr. Alessa. The "gaslighting" that occurred was opposed by Dr. Alessa and the University of Idaho acting on her behalf.

5.      Rather than correct the issue and impose appropriate workplace standards, the Navy harassed Dr. Alessa further. It ordered her to work directly with her harasser and created intolerable working conditions, all while undermining Dr. Alessa's personal and professional reputation with whispers of an extra-marital affair, questioning of her credentials and abilities, and lack of ability to work with others. The Navy engaged in a pattern of reprisal that not only, was not deterred when Dr. Alessa filed a complaint of discrimination, but was instead redoubled, with suggestions to third parties that it was not the Navy being investigated on claims raised by Dr. Alessa, but Dr. Alessa

being investigated by the Navy. The scheme culminated in the Navy terminating Dr. Alessa and her contract, casting aspersions about her and her performance after she was terminated and apparently insuring that other federal agencies did not employ Dr. Alessa or work on her contract.

6.      The result, a wrongful termination, based on direct and continuous violations of law, has undermined a promising program from an internationally recognized expert that can analyze and identify emerging security threats based on coordination between agencies and their employees founded on real time, vetted analysis. Not only does this conduct violate Title VII and involve defamation, it created a hostile work environment punctuated by harassing comments related to religion, and sex.

7.      The severity and absurdity of the work environment was exemplified when Mr. Todd Boone ("Mr. Boone"), the head of the Intelligence Integration Department, contacted Dr. Alessa virtually upon her hire, warned her of working as a woman and declared that she was a "Princess in God's Kingdom" that needed his personal attention and protection as "God's Knight." Mr. Boone was not a supervisor of Dr. Alessa and should have had limited interaction with her.

8.      When Dr. Alessa's program was fully funded by the Office of the Director of National Intelligence (a historic first for the Agency), transforming it from an Agency initiative into a national intelligence Program of Record, the Agency began a series of actions designed to drive Dr. Alessa from the workplace.

9.      When the University of Idaho, which held the contract with the Navy on which Dr. Alessa was deployed, protested the environment, the Agency undertook further actions including a series of retaliatory steps designed to drive Dr. Alessa from the workplace. In that process the two principal antagonists driving the harassment, Mr. Boone and CAPT Edward Westfall ("CAPT Westfall"), falsely implied that Dr. Alessa was having an extra marital affair with a federal

employee who supported her claims, among other defamatory and derogatory claims and accusations.

10.     As a result of Mr. Boone and CAPT Westfall's actions, the Navy cancelled the contract on which Dr. Alessa was a principal and subject matter expert.

11.     Not only did the offending officials cause the Navy to cancel this vital program, designed to protect national security, but Dr. Alessa is convinced that these same officials disparaged her and her work to other federal agencies and thus precluded her from furthering the program government wide.

12.     Dr. Alessa brings this employment action, based on the facts set forth below which establish gender discrimination, religious discrimination, retaliation and reprisal, the creation of a hostile work environment and wrongful termination of her employment in violation of Title VII of the Civil Rights Act.

13.     Further, she brings an individual cause of action against CAPT Westfall and Mr. Boone on the grounds of defamation and defamation per se under District of Columbia law. These pendent claims are properly included in the federal action.

### PARTIES

14.     Plaintiff: **Dr. Lilian Alessa**, was and is a resident of Idaho and was employed by the Department of the Navy, at 4251 Suitland Road, Washington, DC, as a federal employee under the Intergovernmental Personnel Act ("IPA"). Dr. Alessa held a position as Special Advisor to the Director—a Defense Intelligence Senior Level (DISL) equivalent—and Program Manager of the Navy's National Maritime Intelligence-Integration Office ("NMIO").

15.     Defendant: **James E. McPherson** ("Mr. McPherson") is the current Acting Secretary of the Navy.

4

16.     Mr. McPherson is being sued in his official capacity as the current Acting Secretary of the Navy.

17.     On information and belief, Mr. McPherson is a nominal defendant who, pursuant to Title VII, must be named as a party defendant. It is not believed at this time that Mr. McPherson has any personal knowledge of or engaged in any discriminatory conduct toward Dr. Alessa. The true actors at issue are named in the Complaint below.

18.     The Department of the Navy ("Navy" or "Agency") is a military service branch under the Department of Defense.

19.     <u>Defendant:</u> **Edward Westfall** ("CAPT Westfall") is a Captain in the U.S. Coast Guard and the Deputy Director of NMIO. CAPT Westfall is believed to be a resident of the District of Columbia. CAPT Westfall is being sued in his individual capacity on the basis that defamation is a personal tort.

20.     <u>Defendant:</u> **Todd Boone** ("Mr. Boone") is currently believed to be a Portfolio Manager at NMIO and was formerly the Director of Intelligence Integration at NMIO. Mr. Boone is believed to be a resident of the Commonwealth of Virginia. Mr. Boone is being sued in his personal capacity on the basis that defamation is a personal tort.

## JURISDICTION AND VENUE

21.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1343, and 1346 as this action is brought against a United States government agency and also involves federal questions regarding the deprivation of Dr. Alessa's rights under Title VII of the Civil Rights Act.

22.     The Court has pendant and supplemental jurisdiction over the defamation claims against the individual defendants pursuant to 28 U.S.C. § 1367.

5

23.     Venue is proper in the District of Columbia pursuant to 28 U.S.C. § 1391 because Plaintiff was employed by the Department of the Navy in the District of Columbia and events or omissions giving rise to this action, including the unlawful employment practices and defamatory statements, alleged herein, occurred in the District of Columbia.

## STATEMENT OF FACTS

**I.   Exhaustion of Administrative Remedies**

24.     On March 15, 2019 Dr. Alessa made initial contact by telephone and email with Guillermo Tolentino in the EEO Office within the Office of Naval Intelligence to report the discrimination, harassment, and hostile work environment she was suffering, which is set forth more fully below.

25.     Dr. Alessa fully participated and complied with the informal processing of her complaint.

26.     The Agency's EEO Office conducted the final interview on June 11, 2019, and thereafter issued Dr. Alessa a notice of right to file a formal complaint.  The Agency's notice was received on June 17, 2019 by counsel for Dr. Alessa.

27.     Dr. Alessa timely filed a formal complaint of discrimination on July 2, 2019, within the 15 days required from receipt of the notice of right to file.

28.     In her formal complaint Dr. Alessa alleged discrimination on the basis of gender, religion, retaliation and reprisal, hostile work environment, and wrongful termination of her employment.

29.     The Agency issued a formal "Notice of Acknowledgment of Receipt [of the] Formal Complaint" on July 15, 2019 accepting all of Dr. Alessa's claims for investigation., and thereafter assigned an investigator to investigate Dr. Alessa's claims.

30.     Dr. Alessa fully participated and complied with the investigation, including without limitation, submitting a written affidavit in support of her claims on December 16, 2019 pursuant to the request of the investigator, as well as rebuttal affidavits to statements of management officials.

31.     The Agency's investigation period of 180 days expired on December 30, 2019. Pursuant to 29 C.F.R. § 1614.108(e) the Agency unilaterally extended the period by thirty (30) days in order to sanitize and redact classified information from the Report of Investigation.

32.     The Agency dispatched the Report of Investigation on January 27, 2020, and it was received by counsel for Dr. Alessa on February 4, 2020.

33.     More than 180 days has passed since Dr. Alessa filed her formal complaint and the Agency has taken no final action, accordingly Dr. Alessa's claims are now ripe to be heard by the District Court pursuant to 29 C.F.R. § 1614.407(b).

## II.  **Dr. Alessa – Professor and Expert in Big Data**

34.     Dr. Alessa is a President's Professor at the University of Idaho, who served as a Defense Intelligence Senior Level (DISL)-equivalent Special Advisor and as Program Manager for Advanced Data and Analysis, with the Department of Defense through the Intergovernmental Personnel Act until her termination by the Department of the Navy on May 15, 2019.

35.     Dr. Alessa has a storied and extensive career. She has served as Deputy Chief of Global Strategies with the Department of Homeland Security, Office of Strategy, Policy and Plans. Dr. Alessa also worked closely with the federal government and the U.S. military on issues impacting the security of the Artic and developed systems to analyze risks and harms to and in that region, as well as globally. Her skills in developing leadership models to assess national security risks and analyzing complex data systems to identify those risks have been developed through cooperation with and training she has performed for the Departments of Homeland Security and

Defense.

36.     Dr. Alessa has worked on Emerging Threats and Capabilities Programs for the United States and has published six data fusion products focused on critical resources for ensuring security related responses at local and regional scales.

37.     Dr. Alessa has published over 100 peer-reviewed papers and competed for, received, and successfully managed over $100 million in science grants and programs.

38.     Dr. Alessa is one of the Co-Founders for the Community of Modeling in Social Ecological Systems (COMSES), hosted out of Arizona State University (comses.org). She holds courtesy appointments with the Center for Social Dynamics and Complexity at Arizona State University as well as the International Arctic Research Center at the University of Alaska Fairbanks.

39.     Dr. Alessa has also served as an Advisor for the Director of the National Science Foundation.

40.     Dr. Alessa's specialty and expertise is in systems science, including big data analytics. Although the term sounds simplistic, it actually describes a highly complicated methodology for reviewing information.

41.     Big data analytics is the use of advanced analytic techniques against very large, diverse data sets that include structured, semi-structured and unstructured data, from different sources, and in different sizes from terabytes to zettabytes.

42.     "Big data" is a term applied to data sets whose size or type is beyond the ability of traditional relational databases to capture, manage and process with low latency.

43.     Big data has one or more of the following characteristics: high volume, high velocity or high variety. Artificial Intelligence (AI), mobile, social and the Internet of Things (IoT) are driving data complexity through new forms and sources of data. For example, big data comes

from sensors, devices, video/audio, networks, log files, transactional applications, web, and social media—much of it generated in real time and at a very large scale.

44.     Analysis of big data allows analysts, researchers and business users to make better and faster decisions using data that was previously inaccessible or unusable. Businesses can use advanced analytics techniques such as text analytics, machine learning, predictive analytics, data mining, statistics and natural language processing to gain new insights from previously untapped data sources independently or together with existing enterprise data.

45.     Dr. Alessa is a highly respected expert in the field of systems science, including big data analysis, and one of her specialties is in developing systems to collect and analyze data, with an eye to determining emerging threats.

### III. The Navy hires Dr. Alessa under an IPA, based on Specific Expertise and Experience

46.     On April 1, 2018 Rear Admiral Robert Sharp ("RADM Sharp") who served as the Director of the Navy's National Maritime Intelligence-Integration Office ("NMIO") and Commander, Office of Naval Intelligence ("ONI") proposed the Navy hire Dr. Alessa to serve in two roles.

47.     Under RADM Sharp's proposal Dr. Alessa would serve as Special Advisor to the Director, NMIO, in ONI (which was a Defense Intelligence Senior Leader ("DISL") equivalent position), and as Program Manager for the Big Data, Advanced Analytics for Decision Support ("BDAADS") initiative.

48.     RADM Sharp proposed hiring Dr. Alessa under the Intergovernmental Personnel Act of 1970 (5 U.S.C. § 3371, et. seq.) ("IPA"). That Act treats Dr. Alessa, while under the contract, as a federal employee and accords her the full rights as a civil servant, including protections from adverse actions and resort to federal equal employment opportunity procedures and protections.

49.     On May 8, 2018, Dr. Alessa signed the Intergovernmental Personnel Act Assignment Agreement ("IPA Agreement"). Attached as Exhibit 1.

50.     On May 10, 2018, Vice President for Research Janet Nelson, signed the IPA Agreement on behalf of the University of Idaho.

51.     On June 7, 2018, RADM Sharp signed the IPA Agreement on behalf of the Navy and the Agreement took force.

52.     By executing the IPA Agreement RADM Sharp certified, pursuant to Navy Civilian Human Resources requirements, that the IPA Agreement met the requirements and intent of the Department of the Navy and was cost effective and in the best interest of the Department of the Navy.

53.     Under the terms of the IPA Agreement, Dr. Alessa was expressly placed in NMIO to specifically serve as both a Special Advisor for Data Science (DISL-equivalent), and as Program Manager for an Artificial Intelligence/Machine Learning program. See block 16 of Exhibit 1 (IPA Agreement).

54.     Under the IPA, Dr. Alessa provided RADM Sharp with advice. She would also act as a Program Manager and was to help create an information sharing network, to minimize gaps in intelligence. The program required cooperation between federal, state, local, territorial, tribal, law enforcement, defense, and intelligence agencies as well as collaboration with the private sector.

55.     The program was dubbed Big Data, Advanced Analytics for Decision Support ("BDAADS") and designed to use Artificial Intelligence and Machine Learning to gather and analyze data in order to identify intelligence trends and national security threats.

56.     At the time of her hiring Dr. Alessa had more than two decades of experience in obtaining and reviewing data to determine intelligence and national security issues or threats.

57.     Dr. Alessa possesses a Top-Secret Clearance at the TS/SCI level. Prior to joining NMIO, Dr. Alessa worked as Deputy Chief of Global Strategy for the Department of Homeland Security on issues and scenarios involving terrorism, nuclear attack, conventional wars, biological attacks and the threats posed by environmental degradation, and man-made or nature driven pandemics.

58.     By contractual agreement, Dr. Alessa's was to report directly to the Director of NMIO, RADM Sharp.  She was only to take direction from him as her first line supervisor.

59.     Contrary to the terms of the Agreement, instead of reporting directly to RADM Sharp, Dr. Alessa was directed to work with Mr. Boone, who was the Head of the Intelligence Integration Department (GG-15). Boone, in turn, reported to CAPT Westfall, United States Coast Guard (USCG), who was the Deputy Director of NMIO.[1]  CAPT Westfall then reported to RADM Sharp.

60.     Despite U.S. Office of Personnel Management guidance that "(a)ny significant changes in an employee's duties, responsibilities, salary, work assignment location or supervisory relationships should be duly recorded as a modification to the original agreement."[2] This was ignored by the Navy for reasons as yet unknown.

## IV.   Navy Employee Todd Boone, "God's Knight" lectures Dr. Alessa as a Woman on her Role and Proper Place

61.     Immediately upon reporting, Mr. Boone began a campaign of disturbing behavior against Dr. Alessa.

62.     Mr. Boone immediately began proselytizing to Dr. Alessa, discussing his attitudes

---

[1] CAPT Westfall replaced CAPT Schmidt as Deputy Director in July 2018.
[2] From https://www.opm.gov/policy-data-oversight/hiring-information/intergovernment-personnel-act/#url=Provisions, retrieved 4/13/2020; see generally 5 C.F.R. § 334 et. seq; see also 5 C.F.R. § 334.106.

towards women, his view of federal workers and his belief they were arrayed against him, in part because of his faith.

63.     Mr. Boone openly stated that women should be limited from being in the workplace and that it was an error that they were required to be there. Although couching this in a protective mantle, in spoken and written word and deed he stated that he, and only he, could protect women from the potential privations of men in the workplace, and made it clear that he believed women should not be working or at best should be limited to support roles.  Mr. Boone's odd interest in Dr. Alessa, whom he did not know, struck Dr. Alessa as disturbing and possibly sexual in nature.

64.     Mr. Boone also expressed what can only be described as intense paranoia in his dealings toward other personnel at NMIO, and he constantly advised Dr. Alessa she could only trust him and that women in general needed to rely on his guidance. Unprompted, Mr. Boone related to Dr. Alessa that he had personally taken over the religious and behavioral guidance of a female tenant who lived in a property he owned. Dr. Alessa was disturbed by the infusion of Boone's religious convictions, personal life and attitudes toward women into the workplace.

65.     Mr. Boone informed Dr. Alessa that she could not trust anyone in the workplace and that she could only rely on him to tell her the truth.

66.     Mr. Boone told Dr. Alessa she would be subject to inappropriate sexual attention from men. Declaring himself "God's Knight" Mr. Boone stated that Dr. Alessa was "a princess in God's kingdom." Mr. Boone thus combined a sexist attack with a religiously offensive comment in a single phrase.

67.     It is believed that Mr. Boone has not made similar statements about religion, gender roles, and power relationships to male employees and thus treated Dr. Alessa in a disparate fashion.

68.     The statements are direct evidence of religious discrimination and sex

discrimination.

69.     Mr. Boone also falsely claimed to her that he was personally responsible for her selection by the Navy. He also advised Dr. Alessa that she should not cross him as he was responsible for her continued employment.

70.     Between August 18-20, 2018, Dr. Alessa coordinated a stakeholder workshop in Dublin, California, as part of her duties.  Mr. Boone invited, on his own prerogative, Ms. Honey Elias, to take part in the workshop.

71.     During and subsequent to the workshop, Dr. Alessa received both verbal and written complaints about Ms. Elias' performance from workshop participants. Participants stated that Ms. Elias was not performing her duties as a sub-facilitator and was attempting to steer participants input and insert her own.  The complaints were severe enough that the University of Idaho—the workshops co-sponsor and funder—issued a formal letter to Mr. Boone insisting that Elias did not participate in further matters.

72.     On September 5, 2018, Dr. Alessa acting in her Program Manager capacity, held a meeting to discuss Ms. Elias actions and their negative impact on the BDAADS program. Mr. Boone confronted Dr. Alessa and claimed Elias was "under his protection." He chastised Dr. Alessa by claiming that Elias, who is apparently Christian, had properly "behaved."

73.     Dr. Alessa disagreed and advised Mr. Boone that Elias was a poor fit for the program.  Mr. Boone became incensed and verbally assaulted Dr. Alessa. At the conclusion of the meeting, as the participants were leaving, he grabbed her arm and stated, "I made you and I can break you."

74.     On September 19, 2018, Dr. Alessa notified both CAPT Westfall and CDR Andre Wilson, Chief of Staff of NMIO, of the assault and comments inflicted by Mr. Boone. She informed

them that she thought Mr. Boone was a threat to her physical safety and that he was trying to claim authority over her which he lacked under the contract.

75.     Dr. Alessa also informed Mr. Christopher Randall ("Mr. Randall"), Assistant Director for Command Security, Office of Naval Intelligence, that she had been assaulted and was afraid for her safety and security, due to Mr. Boone's actions. Mr. Randall was in charge of the Security Office.

76.     Dr. Alessa followed up with a written complaint to Mr. Randall.

77.     On September 24, 2018, the Command received confirmation of Mr. Boone's erratic, sexist, assaultive and debasing behavior toward Dr. Alessa, from Sean Moon ("Mr. Moon"), a Department of Homeland Security employee supporting the BDAADS program. Mr. Moon specifically advised CAPT Westfall and CDR Wilson—who were Mr. Boone's immediate supervisors—of Mr. Boone's mistreatment of Dr. Alessa.

78.     On September 24, 2018, CAPT Westfall advised both Mr. Moon and Dr. Alessa that he would investigate the matter and stated "(w)e will let you know of our conclusions."

79.     Apparently, no investigation was done and neither Dr. Alessa nor Mr. Moon, were interviewed by the Command nor advised of any results of any Command sponsored investigation.

**V.   The Command Retaliates**

80.     While purportedly reviewing Dr. Alessa's allegations, CAPT Westfall commenced a policy of retaliation and reprisal against Dr. Alessa.

81.     On September 24, 2018, CAPT Westfall ignored Dr. Alessa's assault allegations and claims of inappropriate behavior and ordered Dr. Alessa to work with, and under, Mr. Boone on her projects. Westfall lacked the authority under the IPA to order this change and placed Dr. Alessa directly under the control of her harasser.

14

82.     Dr. Alessa repeatedly asked CAPT Westfall to follow the supervisory chain set forth in the IPA. She also begged him to move her and the program away from Mr. Boone and his influence.

83.     Though he was made fully aware of Mr. Boone's assault, his sexist and religious inspired comments and his actual threats against Dr. Alessa, CAPT Westfall not only failed to correct the situation he continued to amplify the hostile work environment by ordering Dr. Alessa to work under Mr. Boone.

84.     Mr. Boone then isolated Dr. Alessa and in fits of paranoia accused her of being part of some conspiracy. He locked her out of assignments and meetings, deprived her of essential resources to do her job.

85.     CAPT Westfall and Mr. Boone prohibited Dr. Alessa from meeting with RADM Sharpe without their express permission, threatening her with conduct related charges if she jumped their installed version of the chain of command.

86.     In addition, CAPT Westfall and Mr. Boone conducted acts both petty and disturbing as part of the hostile work environment, retaliation, and reprisal.  These included:

a)     Mr. Boone replacing Dr. Alessa's office telephone number listed in the official address book with his own office number, enabling him to redirect and monitor her communications.

b)     Mr. Boone directing Dr. Alessa to provide him detailed time, attendance and travel records including itineraries of her time in Washington D.C., her places of lodging and the nature and extent of her travel. Mr. Boone claimed authority to approve or disapprove of these requests. Mr. Boone also asked Dr. Alessa to provide him with personal details, including her home address, that Dr. Alessa felt highly uncomfortable

about providing.

c)   Mr. Boone directed virtual surveillance of Dr. Alessa in the workplace, instructing federal and contract employees to directly report to him Dr. Alessa's attendance and actions at meetings.

87.   Despite the ongoing harassment, Dr. Alessa continued to diligently perform her duties and developed a formal Program proposal in September 2018 to procure funding for her BDAADS initiative.   She submitted the proposal to the Office of the Director of National Intelligence ("ODNI") Augmenting Intelligence with Machines Program.

88.   On October 11, 2018, Dr. Alessa hosted a meeting to discuss ways in which the BDAADS program could support and coordinate with the NMIO Maritime Security Division. Those attending the meeting included Mr. Moon, Mr. Thomas Darby ("Mr. Darby," who was a member of Dr. Alessa's program management team), Mr. John Sanford ("Mr. Sanford"), Director of the NMIO Maritime Security Division, and members of his staff, including Mr. Christopher Hickey ("Mr. Hickey").   During the course of the meeting, while discussing the activities of international criminal organizations, Mr. Sanford publicly degraded and belittled Dr. Alessa based solely on her sex by stating at the end of her discussion: "what would a little girl know anyway?" The insulting comment was direct evidence of discrimination and a hostile work environment.

89.    Mr. Sanford was a direct subordinate to CAPT Westfall and thus Dr. Alessa complained to CAPT Westfall about the mistreatment. CAPT Westfall appeared to take no action and never advised Dr. Alessa of how he responded.

90.   On December 2, 2018, CAPT Westfall requested that Dr. Alessa remove "Defense Intelligence Senior Level (DISL) equivalent" from her email signature, stating that it was "inappropriate" and not "humble," for her to include the designation. CAPT Westfall ignored that

this was Dr. Alessa's job title and that other male DISL employees at NMIO, were using the moniker in their correspondence.

91.     Dr. Alessa was unable to appeal the issue to RADM Sharp as her access to him was prevented by CAPT Westfall and Mr. Boone, despite the fact RADM Sharp was by contract her direct report.

92.     On January 8, 2019, Dr. Alessa was notified that the Office of the Director of National Intelligence (ODNI) Augmenting Intelligence with Machines (AIM) office had fully funded her BDAADS program, transforming it from a NMIO initiative to a national program of record.

93.     Dr. Alessa was informed that the program funding could not, however, be distributed directly to NMIO for execution, as Mr. Boone had either negligently or intentionally failed to follow proper Agency procedures, who required the Program proposal be routed through him, resulting in a misdirection of the funds themselves.

94.     On January 7, 2019, Mr. Boone refused to allow Dr. Alessa to participate in a management discussion, by implying that she would be interfering with the ability of "leadership" to "do its job." In both her roles as Special Advisor to the Director and Program Manager, Dr. Alessa was in fact, a management official.

95.     On January 24, 2019 Rear Admiral (RDML) Gene Price replaced RADM Sharp as Commander of ONI and Director of NMIO. Accordingly, pursuant to the IPA Agreement RDML Price should have become Dr. Alessa's direct report and supervisor at that time.

96.     On February 5, 2019, Mr. Boone falsely claimed that Dr. Alessa had failed to secure proper approval to designate certain team members to her project. Mr. Boone misrepresented that the matter had not been previously discussed.

97.     On February 13, 2019, Mr. Boone sought to monitor an upcoming trip for Dr. Alessa to return to Washington, D.C., for a week at the end of February. Although contractually authorized to take such a trip, Mr. Boone demanded Dr. Alessa provide him a detailed description of the trip for his approval.

98.     On February 19, 2019, Mr. Boone claimed he would deny the trip.

99.     On February 22, 2019, the ONI Travel Management Coordinator, Ms. Theresa Bearer ("Ms. Bearer") intervened and ensured Dr. Alessa's travel was approved. Due to the lengthy delay, the last-minute ticketing created extreme stress for Dr. Alessa and cost the government additional money.

100.     On March 4, 2019, Dr. Alessa met with CDR Wilson to complain about her mistreatment from Mr. Boone and others, as well as Mr. Boone's overreach regarding the BDAADS program engagement. She complained the work environment was hostile and toxic and that she had faced sexist and religious based comments. CDR Wilson ignored Dr. Alessa and watched the television while she spoke. When Dr. Alessa was finished CDR Wilson dismissively indicated that Dr. Alessa should resign and asked, "what will it take for you to walk away?"

101.     On March 6, 2019, Dr. Andrew Kliskey ("Dr. Kliskey"), the Director for the Center for Resilient Communities at the University of Idaho, disturbed by the manner in which Dr. Alessa was being marginalized and treated, formally protested Dr. Alessa's mistreatment. The letter clearly targeted Mr. Boone stating that he was "highly unprofessional, perhaps even abusive." It further decried the fact "that Mr. Boone's treatment of, and expressed attitude toward, Dr. Alessa is a form of harassment." Attached as Exhibit 2.

102.     The Navy responded by pressuring Alessa to resign.

103.     On March 15, 2019, facing demands that she resign, and an intolerable work

environment punctuated by threats, harassment, isolation and religious and sex-based discrimination, Dr. Alessa made initial contact with the Navy EEO Office. She then filed an informal complaint based on gender and religious discrimination, a hostile work environment, and retaliation and reprisal for opposing that work environment through protected disclosures made by her and by the University of Idaho to management.

104.    That afternoon, apparently in direct and proximate retaliation for Dr. Alessa's EEO complaint, RDML Price, Director of NMIO, suspended all government employee activity in support of Dr. Alessa's BDAADS program. On information and belief CAPT Westfall advised RDML Price to make such a decision. The result was to effectively shut down the program.

105.    On April 2, 2019, while Dr. Alessa was in Washington, D.C., performing her duties as Special Advisor and engaging with Federal interagency partners, she was informed by Mr. Tom Darby ("Mr. Darby") that she was banned from NMIO spaces by the staff attorney, Mr. Gary Kahlil ("Mr. Kahlil"). Their purported reasoning was that "all [Dr. Alessa's] work is BDAADS and BDAADS is in a stop-work status." Notwithstanding, their action again appeared retaliatory for Dr. Alessa's EEO complaint and was violative of the IPA Agreement which is clearly broader than just the BDAADS program.

106.    Subsequently Dr. Alessa submitted work travel requests to perform her duties not related to the BDAADS program for the week of April 23-27, 2019. These were denied by CAPT Westfall and CDR Wilson, for reasons unknown, but they effectively prevented Dr. Alessa from performing her job duties.

107.    On April 21, 2019, Dr. Alessa contacted RDML Price informing him of her EEO complaint and requesting his assistance in maintaining a proper and efficient continuation of the program.

108.    Upon being informed of Dr. Alessa's complaint, RDML Price consulted with CAPT Westfall and Mr. Boone, the primary perpetrators of the religious and gender discrimination and hostile work environment that Dr. Alessa was subjected to, as to the disposition of the case. Never once did he discuss the complaint or the BDAADS program with Dr. Alessa.

109.    On April 23, 2019, in direct retaliation for Dr. Alessa's EEO complaint and the disclosure of such to RDML Price, CAPT Westfall and CDR Wilson directed a staff member, Mr. Hickey, to write an email to a key potential program partner, the Port of Long Beach, California forbidding the Port from communicating further with Dr. Alessa regarding an upcoming meeting.

110.    In Mr. Hickey's email, he and thus the Agency improperly and falsely suggested that it was Dr. Alessa who was under investigation for conduct related reasons and thus should be excluded from discussions with the Port.

111.    The only investigation involving Dr. Alessa stemmed from her own EEO complaint against the Navy.

112.    On May 6, 2019, while attempting to use the Total Workforce Management System to complete Navy-mandated on-line training, Dr. Alessa discovered that she had been locked out of her account.

113.    On May 10, 2019, less than two months after Dr. Alessa initiated her EEO complaint of discrimination, the Navy, by RDML Price, terminated Dr. Alessa despite her outstanding performance and history of merit. During the telephone conversation, RDML Price claimed that he was terminating the IPA Agreement, and therefore Dr. Alessa's employment with the Navy, because NMIO was not the right place for the program.  However, he stated during the call that he "frankly didn't know much" about the program itself. The termination occurred more than thirteen months before the actual contract reevaluation period triggered.

114.     During the May 10, 2019, phone call, RDML Price assured Dr. Alessa that she would be provided with a formal 30-day period in which to transition the program to another federal entity.  No transition period ever occurred.

115.     Instead, on May 15, 2019 CAPT Westfall transmitted via email, after working hours, a letter to the University of Idaho signed by RDML Price on May 9, 2019, terminating the IPA Agreement effective on May 15, 2019. No explanation was given as to why the Navy waited six (6) days to transmit the time sensitive correspondence and it appears RDML Price's comments on the May 10, 2019, telephone call were based on a lack of information or were simply misleading.

116.     The purported reasoning for divesting the program and terminating Dr. Alessa, that her program did not fit in their mission profile, was completely pretextual and retaliatory.

117.     Prior to Dr. Alessa filing an EEO complaint with the agency, RADM Sharp had lauded her and the BDAADS program. Moreover, her program was in the process of transitioning to a formal national program of record through its funding by the Office of the Director of National Intelligence.  RADM Sharp publicly congratulated Dr. Alessa for being the driving force in achieving that historic, first-ever funding for the Office of Naval Intelligence.

118.     Additionally, RADM Sharp wrote Dr. Alessa a letter of recommendation in January 2019, to receive an award from the University of Idaho.  While Dr. Alessa never officially received a performance review, RADM Sharp's letter serves as a review of her performance by her direct supervisor pursuant to the IPA.  Attached as Exhibit 3.

**VI. <u>Post-Employment Reprisal</u>**

119.     After the Navy terminated Dr. Alessa's program, Dr. Alessa sought to move the program to another federal Department or Agency, as it remained a fully funded ODNI program of record.

120.     During the week of May 13 to 18, 2019, Dr. Alessa travelled from Idaho to Washington, D.C., in order to transition the program, under NMIO-issued government travel orders. On May 16, 2019, Ms. Elaine Rigas ("Ms. Rigas," formerly Ms. Tsimpos) learned that Dr. Alessa was scheduled to be on site at the National Maritime Intelligence Center, which also housed NMIO, for a colleague's change of command ceremony.

121.     On May 17, 2019, at 11:13 AM, the Navy cancelled Dr. Alessa's government credentials, resulting in the cancellation of her return flight to Idaho by the military travel office, stranding her in Washington, D.C., and preventing her from filing a travel claim.

122.     Not content with Dr. Alessa's termination, CAPT Westfall and Mr. Boone continued their campaign of retaliation and defamation.  Both men spread lies and rumors throughout the intelligence and law enforcement communities, and to international partners such as the Canadian Department of Defence in an attempt to discredit Dr. Alessa and prevent her from regaining federal employment by moving her program of record to another federal organization.

123.     On or about the first week of April, 2019, the Department of Homeland Security Inspector General received an anonymous, internet complaint alleging that Mr. Moon and Dr. Alessa were engaged in an extra-marital affair and that this prohibited sexual relationship negatively impacted the work environment and resulted in "an individual " losing their position.

124.     On August 28, 2019, the Office of the Inspector General notified the DHS Anti-Harassment Unit (AHU) of the complaint.  The AHU conducted a fact-finding investigation, concluding that the allegations were spurious, and appeared to be retaliation for Dr. Alessa's EEO complaint. Given statements subsequently made by Mr. Boone and CAPT Westfall in their sworn statements during the EEO portion of the investigation, and given the fact the report was made within days of an adverse action against Mr. Boone, that transferred him from a supervisory position

on or about May 15, 2019, it appears the source of the claimed infidelity was Mr. Boone.

125.     Upon information and belief Mr. Boone and CAPT Westfall communicated their belief that Dr. Alessa was having an extra-marital affair to senior Navy officials as part of their scheme to discredit and bring disrepute to Dr. Alessa and their statements factored into the Navy's decision to terminate Dr. Alessa.

126.     These statements were disseminated in the intelligence sphere where Dr. Alessa was employed and were designed to harm her in her trade or profession.

127.     Dr. Alessa was advised by CDR James Valentine, ("CDR Valentine") USCG, Senior Adviser to the U.S. Council on Transnational Organized Crime in July 2019, that CAPT Westfall had publicly stated falsehoods at the June ODNI National Intelligence Manager (NIM) meeting.  Specifically, CAPT Westfall told Ms. Nicole Wells ("Ms. Wells"), a NIM-Transnational Crime, Homeland, and Western Hemisphere (NIM-THW) staff member; Ms. Kelly Parks ("Ms. Parks"), an ODNI Legislative Affairs staff member; Mr. Michael Shimoff ("Mr. Shimoff"), another NIM-THW staff member; and Mr. Jason Wang ("Mr. Wang"), a National Security Agency staff member, that Dr. Alessa had been fired for cause, had her security clearance revoked, that she exaggerated her credentials, and was an insider threat.

128.     Such a statement was false, misleading, derogatory of Dr. Alessa in her trade and profession, suggested criminality or serious misconduct and was done either maliciously or out of gross negligence for the truth.

129.     It also was designed to imply that Dr. Alessa had committed serious misconduct and was a threat to national security to such an extent that her clearance had been revoked.

130.     CDR Valentine was informed of CAPT Westfall's statements by Mr. Eric Downes ("Mr. Downes") of U.S. Coast Guard Intelligence.  Mr. Downes subsequently confirmed that the

false statements were made.  Mr. Downes also confirmed that on or around the same time, CAPT

Westfall made the same false statements to Mr. Michael Potts ("Mr. Potts") and Mr. Christopher

Demi ("Mr. Demi"), the senior leadership of U.S. Coast Guard Intelligence.

131.    Ms. Wells subsequently spread the false information to Ms. Emily Kepler ("Ms.

Kepler"), Director of Collections, and Mr. Brian Murphy ("Mr. Murphy"), Principal Deputy Under

Secretary, at the DHS Office of Intelligence and Analysis.

132.    Mr. Shimoff spread the false information to Ms. Phyllis Corley ("Ms. Corley"),

Director of the ODNI Advanced Campaign Cell.  Ms. Corley, a colleague of Dr. Alessa's, told him

to stop spreading rumors and notified Dr. Alessa.

133.    Dr. Alessa was advised on August 26, 2019, by Mr. Howard Charles ("Mr.

Charles") of U.S. Customs and Border Protection ("CBP"), that Mr. Murphy had further

disseminated the falsehoods, going so far as to call Deputy Executive Assistant Commissioner Linda

Jacksta ("DEAC Jacksta") at the Office of Operations Support and Assistant Commissioner James

Collins ("AC Collins") at the Office of Intelligence, CBP, to warn them against hiring Dr. Alessa

or accepting her program for execution within CBP.  Murphy told DEAC Jacksta and AC Collins

that Dr. Alessa inflated her qualifications, had been terminated by NMIO for cause, had her

clearance revoked, and that he believed her to be an "insider threat."  Murphy relied on CAPT

Westfall and/or Mr. Boone and/or Ms. Kepler for his information.

134.    These statements were issued as statements of fact, not opinion, and they were false,

misleading and made with knowledge of their falsity, malice or a reckless disregard for the trust.

They were designed to state or imply that Dr. Alessa had been fired for serious misconduct and was

a threat to national security.

135.    The information impaired Dr. Alessa in her trade or profession and was false,

misleading and done either out of malice or with a reckless disregard for the truth and veracity of the statements that were made.

136.     The statements both expressed and implied serious misconduct and were intended to and did cause harm to Dr. Alessa in her trade and profession.

137.     The spreading of the falsehoods against Dr. Alessa was so grave, and so damaging, that on September 8, 2019, the General Counsel of the University of Idaho, Mr. Kent Nelson ("Mr. Nelson") sent a letter to Mr. Andrew Levitz ("Mr. Levitz"), General Counsel at ONI,  requesting that he inform the new Director of NMIO, Rear Admiral Kelly Aeschbach ("RADM Aeschbach"), USN, of the situation and that she direct the NMIO staff to cease spreading this misinformation and to reach out to those individuals and agencies who were recipients of the misinformation and make appropriate corrections. Attached as Exhibit 4.

138.     Although given the opportunity to mitigate the spread of defamatory comments, the Navy ignored the letter.

139.      On November 6, 2019, Lieutenant Commander Michael Bielby ("LCDR Bielby"), of Canadian Defense Forces, stated that CAPT Westfall had told participants in a Maritime Roundtable meeting in Australia (including LCDR Bielby) *that Dr. Alessa had been fired for cause, had her security clearance revoked, exaggerated her credentials, and was an insider threat*.

140.     These statements were issued as statements of fact, not opinion, and they were false, misleading and made with knowledge of their falsity, malice or a reckless disregard for the trust. They were designed to state or imply that Dr. Alessa had been fired for serious misconduct and was a threat to national security.

141.     Dr. Alessa was and has been damaged in her trade and profession by these statements.

142.     As a result of the actions of CAPT Westfall and Mr. Boone a Federal National Intelligence Program of Record, deemed critical to national security and defense, was terminated by the Navy and then blocked from acceptance by other agencies due directly to the action of Mr. Boone, CAPT Westfall and other members of the Agency.

143.     NMIO failed to provide the required 30-day transition period which would have allowed Dr. Alessa to transfer the Program of Record to willing partners. NMIO equated the 30-day transition period to "pay" which did not mitigate the damages caused by the failure to transition the Program.

144.     During the 30 days following the termination of the IPA, and continuing through at least November, 2019, CAPT Westfall engaged in defamatory language, specifically informing others that Dr. Alessa had been "terminated for cause, lost her security clearance and had misrepresented her credentials"; these rumors resulted in personal trauma and professional damage that continues today.

145.     Mr. Boone engaged in defamatory language stating that Dr. Alessa's work was under investigation. She never was; instead, one of the capabilities she developed has been incorporated into the White House's Arctic Security Roadmap as well as adopted by the DOD.

146.     The Center for Resilient Communities at UI, and Dr. Alessa, personally have failed to recover the expenses and financial instability incurred from the sudden termination of the IPA.

147.     Dr. Alessa's credit score was damaged due to NMIO failing to reconcile travel authorized by RDML Price.  NMIO has yet to reimburse Dr. Alessa for NMIO-approved official travel, resultant from their cancelling her government credentials and access to the Defense Travel Management System, preventing her from filing a travel voucher.

148.     Dr. Alessa continues to experience mental anguish and stress-related health issues related to gender discrimination, religious discrimination, retaliation and reprisal, the creation of a hostile work environment, and wrongful termination of her employment in violation of Title VII of the Civil Rights.

149.     In December 2019, the University of Idaho estimated that the University (and therefore Dr. Alessa) suffered an estimated $5,386,000.00 in damages, of which the damage to Dr. Alessa's reputation due to NMIO's bad faith termination of the IPA accounts was in excess of $3,000,000.

150.     The University of Idaho was deprived of $2 million USD consisting of Dr. Alessa's salary and benefits plus a 26% administrative overhead burden for off-site projects over the five-year program life, impacting both Dr. Alessa's income and her professional standing.

151.     Part of Dr. Alessa's collateral duties as a professor is to actively seek and obtain grants and other research and program initiatives, in addition to teach core curriculum for the University.  Likewise, Dr. Alessa's compensation with the University is set up on a nine (9) month basis, with the understanding that she will procure other compensation throughout the year. Accordingly, Dr. Alessa being terminated from the Navy had a severe and dire impact on her financial situation, as well as a severe impact on her professional reputation, thereby inhibiting her efforts to either relocate the BDAADS program or otherwise procure additional grants and compensation.

152.     As a further result of the Defendant's actions, a valuable program was terminated due to discriminatory animus and a result of the termination of the program Defendant effectively and constructively discharged Dr. Alessa by creating an atmosphere of hostility in the workplace that severely impacted Dr. Alessa both emotionally and mentally.

153.     Defendants   actions   were   retaliatory   due   to   Dr.   Alessa's   complaints   for discrimination.

**COUNT ONE**
**Gender Discrimination Under Title VII of the**
**Civil Rights Act of 1964**
**(Harassment and Disparate Treatment)**

154.     Paragraphs 1-153 are realleged and incorporated by reference as if fully set forth herein.

155.     Title VII of the Civil Rights Act of 1964, ("Title VII") prohibits discrimination in employment on the basis of gender.

156.     Specifically, no employer shall discharge or otherwise discriminate against any individual with respect to her compensation, terms, conditions, or privileges of employment, because of such individuals sex.

157.     Dr. Alessa is a female and always identified herself as female.

158.     Mr. Boone, CAPT Westfall and Dr. Alessa's other colleagues at the Navy were aware, from the first time they respectively met her, of her being female.

159.     The Navy, and, Mr. Boone and CAPT Westfall, engaged in a pattern and practice of discrimination against Dr. Alessa in violation of Title VII on the basis of her gender.

160.     Shortly after Dr. Alessa met Mr. Boone he sent her a message declaring, "you are a Princess in God's Kingdom and I am God's Knight."

161.     Mr. Boone continued to assert to Dr. Alessa that women in the workplace needed protection, and that other people at NMIO would "damage" her but that he would "protect" her.  He also repeatedly told her that everyone else at NMIO was a liar and that she should only get "the truth" from him directly.

162.     On September 5, 2018, following a meeting to discuss the poor performance of

another team member at a workshop, Mr. Boone threatened Dr. Alessa by saying, "I made you, I can break you."

163.     These statements, among others, which Mr. Boone continuously and repeatedly made to Dr. Alessa were sexist and discriminatory based on Dr. Alessa being a female.

164.     Mr. Boone's statements and treatment of Dr. Alessa were intended to belittle, condescend, intimidate and otherwise make Dr. Alessa feel second class because she was a woman.

165.     Mr. Boone did not verbally harass Dr. Alessa's male colleagues.

166.     Mr. Boone began withholding information from Dr. Alessa regarding projects she was directly involved with, and otherwise undermining her authority and ability to perform her duties in both her roles as Special Advisor and as Program Manager. Despite Dr. Alessa's repeated requests for necessary information to perform her duties, Mr. Boone continued to withhold such information.

167.     Mr. Boone did not withhold information from Dr. Alessa's male colleagues, nor did he undermine their authority or ability to perform their job duties.

168.     Alternatively, when confronted by male colleagues, Mr. Boone would provide required information.

169.     After Dr. Alessa complained to the command regarding Mr. Boone's behavior—including directly to CAPT Westfall—CAPT Westfall did not take appropriate action to address her complaint and in fact required her to continue to "report" to Mr. Boone despite her allegations of his harassment, and in violation of the IPA Agreement.

170.     CAPT Westfall had a duty and obligation, under law and service regulations, to take appropriate action.  CAPT Westfall was aware of his responsibilities.

171.     Moreover, CAPT Westfall began to retaliate against Dr. Alessa, as set forth further

below.

172.     CAPT Westfall took appropriate action to address complaints brought by Dr. Alessa's male colleagues and did not retaliate against them.  For example, when CDR Valentine, who was scheduled to be assigned to NMIO in the summer of 2019 under Permanent Change of Station orders, expressed concern for his personal and professional safety if required to work with Mr. Boone, who knew he supported Dr. Alessa's EEO complaint. Instead of accepting the transfer, CDR Valentine requested either retirement or a change in assignment, CAPT Westfall concurred and approved a retirement for the Commander.

173.     At all times relevant hereto, Dr. Alessa fully performed her job duties and met the legitimate expectations of the Navy in the performance of her job.  Indeed, Dr. Alessa exceeded those requirements by obtaining full funding for the BDAADS program, a historic first for ONI.

174.     As a result of the Navy's illegal discrimination, and particularly that of Mr. Boone and CAPT Westfall against Dr. Alessa based on her gender, the Navy is liable to Dr. Alessa under Title VII.

175.     Dr. Alessa suffered damages as a result of Defendants' unlawful gender discrimination, including physical injury, mental and emotional distress, past and future lost wages and benefits, and the costs of bringing this action.

**COUNT TWO**
**Religious Discrimination Under Title VII of the**
**Civil Rights Act of 1964**
**(Harassment and Disparate Treatment)**

176.     Paragraphs 1-175 are realleged and incorporated by reference as if fully set forth herein.

177.     Title VII of the Civil Rights Act of 1964, ("Title VII") prohibits discrimination in

employment based on religion.

178.    Specifically, no employer shall discharge or otherwise discriminate against any individual with respect to her compensation, terms, conditions, or privileges of employment, because of such individual's religion.

179.    Dr. Alessa is a non-practicing, non-evangelical Christian.

180.    Mr. Boone is a self-described Protestant Christian.

181.    At all times relevant hereto, Mr. Boone was aware of Dr. Alessa's religious beliefs.

182.    The Navy, and, Mr. Boone, engaged in a pattern and practice of discrimination against Dr. Alessa in violation of Title VII on the basis of her religion.

183.    Shortly after Dr. Alessa met Mr. Boone he sent her a message declaring, "you are a Princess in God's Kingdom and I am God's Knight."

184.    Mr. Boone continued to force upon Dr. Alessa his religious-based views that women needed protection from men and that he would protect her.

185.    He also repeatedly told Dr. Alessa that she should only get "the truth" from him directly, inferring that his religious views were more enlightened than anyone else.

186.    When Dr. Alessa did not acquiesce to Mr. Boone's religious views and accept his "protection," he began to treat her less favorably than her counterparts who did acquiesce to his religious views.

187.    Specifically, in August and September 2018, Mr. Boone repeatedly defended the poor performance of Ms. Elias based on her acceptance of his religious-based views regarding the appropriate place and conduct of women in the workforce.  Mr. Boone's defense of Ms. Elias was at the expense of Dr. Alessa and the effective management of her BDAADS program, and despite multiple complaints regarding Ms. Elias' performance.

188.     Further, on September 5, 2018, following a meeting to discuss the poor performance of Ms. Elias, Mr. Boone threatened Dr. Alessa by saying, "I made you, I can break you."

189.     These statements, among others, which Mr. Boone continuously and repeatedly made to Dr. Alessa were discriminatory based on Dr. Alessa not sharing Mr. Boone's religious-based views or complying with his beliefs in her appropriate role and behavior in the workplace.

190.     Mr. Boone's statements and treatment of Dr. Alessa were intended to belittle, condescend, intimidate and otherwise make Dr. Alessa feel second class because she did not share his religious views.

191.     Mr. Boone did not verbally harass or demean Dr. Alessa's colleagues who accepted his religious views or did not openly challenge them.

192.     As a result of Dr. Alessa not sharing his religious views, Mr. Boone began withholding information from Dr. Alessa regarding projects she was directly involved with, and otherwise undermining her authority and ability to perform her duties as Special Advisor. Despite Dr. Alessa's repeated requests for necessary information to perform her duties, Mr. Boone continued to withhold such information.

193.     Mr. Boone did not withhold information from Dr. Alessa's colleagues, who acquiesced or remained silent regarding his religious views, nor did he undermine their authority or ability to perform their job duties.

194.     After Dr. Alessa complained to the command regarding Mr. Boone's behavior—including directly to CAPT Westfall—CAPT Westfall did not take appropriate action to address her complaint and in fact required her to continue to "report" to Mr. Boone despite her allegations of his harassment, and in violation of the IPA Agreement.

195.    CAPT Westfall had a duty and obligation, under law and service regulations, to take appropriate action.  CAPT Westfall was aware of his responsibilities.

196.    Moreover, CAPT Westfall began to retaliate against Dr. Alessa, as set forth further below.

197.    At all times relevant hereto, Dr. Alessa fully performed her job duties and met the legitimate expectations of the Navy in the performance of her job.  Indeed, Dr. Alessa exceeded those requirements by obtaining full funding for the BDAADS program, a historic first for ONI.

198.    Mr. Boone made false allegations against Dr. Alessa to senior Navy officials as a direct result of Dr. Alessa not sharing Mr. Boone's religious views.

199.    As a direct result of Mr. Boone's fabricated allegations and complaints against Dr. Alessa, due to her religious views, she was wrongfully terminated.

200.    As a result of the Navy's illegal discrimination, and particularly that of Mr. Boone against Dr. Alessa based on her religion, the Navy is liable to Dr. Alessa under Title VII.

201.    Dr. Alessa suffered damages as a result of Defendants' unlawful gender discrimination, including physical injury, mental and emotional distress, past and future lost wages and benefits, and the costs of bringing this action.

**COUNT THREE**
**Gender and Religious Discrimination Under Title VII**
**of the Civil Rights Act of 1964**
**(Harassment and Disparate Treatment)**

202.    Paragraphs 1-201 are realleged and incorporated by reference as if fully set forth herein.

203.    Title VII of the Civil Rights Act of 1964, ("Title VII") prohibits discrimination in employment based on gender or religion, among other protected categories.

204.    Specifically, no employer shall discharge or otherwise discriminate against any

individual with respect to her compensation, terms, conditions, or privileges of employment, because of such individuals gender and/or religion.

205.     At all times relevant hereto, Mr. Boone and CAPT Westfall were aware of Dr. Alessa's gender and religious beliefs.

206.     The Navy, and, Mr. Boone and CAPT Westfall, engaged in a pattern and practice of discrimination against Dr. Alessa in violation of Title VII on the basis of her gender and religion.

207.     Shortly after Dr. Alessa met Mr. Boone he sent her a message declaring, "you are a Princess in God's Kingdom and I am God's Knight."

208.     Mr. Boone continued to assert to Dr. Alessa that women in the workplace needed protection, and that other people at NMIO would "damage" her but that he would "protect" her.  He also repeatedly told her that everyone else at NMIO was a liar and that she should only get "the truth" from him directly. He made these assertions based on his religious views of gender roles.

209.     When Dr. Alessa did not acquiesce to Mr. Boone's religious views or his view of gender roles and accept his "protection," he began to treat her less favorably than her counterparts.

210.     As described herein, Mr. Boone defended Ms. Elias and treated her more favorably than Dr. Alessa, despite Ms. Elias' poor performance, based on Dr. Alessa's gender and religion.

211.     Further, on September 5, 2018, following a meeting to discuss the poor performance of Ms. Elias, Mr. Boone threatened Dr. Alessa by saying, "I made you, I can break you." Mr. Boone's threat was a direct result of him imposing his religious views and notion of gender roles on Dr. Alessa.

212.     These statements, among others, which Mr. Boone continuously and repeatedly made to Dr. Alessa were discriminatory based on Dr. Alessa not sharing Mr. Boone's views on gender roles or religion.

213.     Mr. Boone's statements and treatment of Dr. Alessa were intended to belittle, condescend, intimidate and otherwise make Dr. Alessa feel second class because she did not share his views on gender roles or religion.

214.     Mr. Boone did not verbally harass or demean Dr. Alessa's colleagues who accepted his views on gender roles and religion, or those who did not openly challenge them.

215.     As a result of Dr. Alessa not sharing his views on gender roles or religion, Mr. Boone began withholding information from Dr. Alessa regarding projects she was directly involved with, and otherwise undermining her authority and ability to perform her duties as Special Advisor. Despite Dr. Alessa's repeated requests for necessary information to perform her duties, Mr. Boone continued to withhold such information.

216.     Mr. Boone did not withhold information from Dr. Alessa's colleagues or undermine their authority or ability to perform their job duties, to the extent they acquiesced to his view of gender roles and religion.

217.     After Dr. Alessa complained to the command regarding Mr. Boone's behavior—including directly to CAPT Westfall—CAPT Westfall did not take appropriate action to address her complaint and in fact required her to continue to "report" to Mr. Boone despite her allegations of his harassment, and in violation of the IPA Agreement.

218.     CAPT Westfall had a duty and obligation, under law and service regulations, to take appropriate action.  CAPT Westfall was aware of his responsibilities.

219.     Moreover, CAPT Westfall began to retaliate against Dr. Alessa, as set forth further below.

220.     CAPT Westfall did not retaliate against Dr. Alessa's colleagues who similarly complained about Mr. Boone's views on gender roles and religion, and his treatment of Dr. Alessa.

For example, no retaliation was taken against Mr. Moon when he initially notified CAPT Westfall and CDR Wilson on multiple occasions that Boone's behavior was contrary to good order, discipline, law, and regulation.

221.    At all times relevant hereto, Dr. Alessa fully performed her job duties and met the legitimate expectations of the Navy in the performance of her job.  Indeed, Dr. Alessa exceeded those requirements by obtaining full funding for the BDAADS program, a historic first for ONI.

222.    Mr. Boone made false allegations against Dr. Alessa to senior Navy officials as a direct result of Dr. Alessa's gender and differing religious views.

223.    As a direct result of Mr. Boone's fabricated allegations and complaints against Dr. Alessa she was wrongfully terminated.

224.    As a result of the Navy's illegal discrimination, and particularly that of Mr. Boone and CAPT Westfall against Dr. Alessa based on her gender and religion, the Navy is liable to Dr. Alessa under Title VII.

225.    Dr. Alessa suffered damages as a result of Defendants' unlawful gender discrimination, including physical injury, mental and emotional distress, past and future lost wages and benefits, and the costs of bringing this action.

**COUNT FOUR**
**Retaliation and Reprisal for Protected Activity under Title**
**VII of the Civil Rights Act of 1964**

226.    Paragraphs 1-225 are realleged and incorporated by reference as if fully set forth herein.

227.    Title VII's anti-retaliation provision makes it unlawful for an employer to "discriminate against any of his employees or applicants for employment because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because [the

employee or applicant] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e- 3(a).

228. Title VII's anti-retaliation provision protects an employee who engages in "opposition" to "any practice made an unlawful employment practice" by the statute. *Id.*

229. Dr. Alessa engaged in protected EEO activity and as a direct result and in retaliation for her complaints, the Navy terminated her position.

230. On September 19, 2018, Dr. Alessa engaged in protected activity when she notified Defendants directly about the discriminatory treatment and harassment she experienced under their employment.

231. Specifically, Dr. Alessa complained to the command, including to both CAPT Westfall and CDR Wilson regarding the discriminatory treatment, harassment, and hostile environment she was experiencing from Mr. Boone.

232. On September 24, 2018, Mr. Moon, a colleague of Dr. Alessa, engaged in protected activity when he notified Defendants directly of Mr. Boone's discriminatory treatment and harassment of Dr. Alessa.

233. Almost contemporaneous to Dr. Alessa's complaints, Mr. Boone and CAPT Westfall began undermining Dr. Alessa's ability to access senior leadership, in a concerted effort to cause Dr. Alessa to quit.

234. In January 2019, Mr. Boone and CAPT Westfall increased the pressure on Dr. Alessa to quit, falsely informing her that the funding for the NMIO program might not be available for 2019, causing significant stress and unnecessary work for Dr. Alessa. When male colleagues pressed the issue, Mr. Boone admitted that the funds were already programmed.

235. On March 4, 2019, the Defendants asked Dr. Alessa to resign her position.

236.     On March 15, 2019, Dr. Alessa engaged in an informal complaint process for

hostile work environment, religious discrimination, gender discrimination, and retaliation

and reprisal with the EEO office. Initiating her informal EEO complaint was protected activity.

237.     Shortly after filing her complaint with the EEO office on March 15, 2019, RDML

Price, Director, NMIO, and Commander, Office of Naval Intelligence issued an email titled

"Suspension of All Government Employee Activity in Support of BDAADS" bringing the program

Dr. Alessa worked under to a stop.

238.     RDML Price's decision to suspend work on Dr. Alessa's BDAADS program was a

direct result of Dr. Alessa initiating an EEO complaint and retaliation for her protected activity.

239.     On April 2, 2019, Dr. Alessa was informed by Mr. Darby that she was banned from

NMIO spaces by the staff attorney, Mr. Gary Kahlil, as "all [Dr. Alessa's] work is BDAADS and

BDAADS is in a stop-work status."

240.     Dr. Alessa's April 17, 2019 travel requests for the week of April 23-27 was denied

by CAPT Westfall and CDR Wilson, preventing her from performing her non-BDAADS job duties

as Special Advisor.

241.     On April 21, 2019, Dr. Alessa contacted RDML Price, advising him of her EEO

complaint.

242.     On June 10, 2019, just three months after Dr. Alessa formally complained of

discrimination, Defendant by RDML Price discharged Dr. Alessa notwithstanding Dr. Alessa's

outstanding performance and history of merit.

243.     Defendant's alleged reason for constructively discharging and subsequently

terminating Dr. Alessa's employment is pretextual and baseless. Defendant attempted to fire Dr.

Alessa because she complained of gender discrimination, religious discrimination, and harassment

on multiple occasions, specifically on September 19, 2018, September 24, 2018 and through a formal EEO complaint on March 15, 2019.

244.    Dr. Alessa was qualified for her position and capable of performing all essential functions when Defendants terminated her.

245.    The Navy is liable for the acts of its agent employees in retaliating against Dr. Alessa for her protected activity.

246.    Dr. Alessa suffered damages as a result of Defendants' unlawful retaliatory actions, including physical injury, mental and emotional distress, past and future lost wages and benefits, and the costs of bringing this action.

## COUNT FIVE
## Hostile Work Environment

247.    Paragraphs 1-246 are realleged and incorporated by reference as if fully set forth herein.

248.    Title VII prohibits discrimination against an employee by creating a hostile work environment.

249.    A hostile work environment exists "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Singletary v. District of Columbia*, 351 F.3d 519, 526 (D.C. Cir. 2003).

250.    As set forth above, Mr. Boone continuously and repeatedly harassed Dr. Alessa and subjected her to a hostile work environment because of her gender and religious views and in retaliation for her protected activity.

251.    Mr. Boone physically threatened to harm Dr. Alessa, thereby degrading the

working environment and making it hostile.

252.    Indeed, after Dr. Alessa made initial contact with the EEO office the level of hostility from both Mr. Boone and CAPT Westfall increased.

253.    Dr. Alessa was forced to work in an environment where she feared for her physical safety, as well as her psychological and emotional well-being.

254.    Defendant's repeated disregard for Dr. Alessa's complaints, as well as Mr. Boone's continued abuses created an abusive and unbearable environment in which Dr. Alessa could not work.

255.    The Navy and its management, in Mr. Boone and CAPT Westfall, subjected Dr. Alessa to a severe and pervasive hostile work environment that negatively and effectively changed the terms and conditions of her employment.

256.    The Navy is liable to Dr. Alessa for the misconduct of its employees, Mr. Boone and CAPT Westfall.

**COUNT SIX**
**Defamation and Defamation Per Se**
**(Against Defendant Todd Boone individually)**

257.    Paragraphs 1-256 are realleged and incorporated by reference as if fully set forth herein.

258.    Mr. Boone intentionally made false and defamatory statements regarding Dr. Alessa's conduct and actions, with the intent to harm Dr. Alessa.

259.    Mr. Boone disseminated his false statements, both verbally and in writing to third parties, including without limitation, senior Navy officials, the DHS Inspector General and others within the intelligence community.

260.    Specifically, Mr. Boone declared to senior Navy officials and/or the Inspector

General that Dr. Alessa and her colleague Mr. Moon were engaged in an extra-marital affair.

261.     If it were true, the statements implied that such a relationship would also be a prohibited romantic relationship under Agency guidelines, a factually inaccurate statement.

262.     Mr. Boone intentionally made the statements with the intent to harm Dr. Alessa.

263.     Mr. Boone's statement regarding an extra-marital affair is defamation *per se* and actionable as a matter of law irrespective of special harm.

264.     Mr. Boone's statement was intended to injure Dr. Alessa in her profession and standing within the academic and intelligence community.

265.     Damages are presumed as a result of the statements being defamation *per se*.

266.     Notwithstanding, but in the alternative, Mr. Boone's statements caused Dr. Alessa severe and special harm specifically with respect to her professional reputation within the academic and intelligence community and her ability to move her BDAADS program to another Agency within the federal government.

267.     Dr. Alessa has and will suffer severe harm in her ability to procure grants and other employment opportunities which are expected as part of her duties with the University of Idaho and in addition to course curriculum.

268.     Dr. Alessa is entitled to recover compensatory damages, which are presumed, and as a result of the damage to her reputation.

269.     In addition, Dr. Alessa is entitled to recover punitive damages due to the intentional, willful and reckless actions of Mr. Boone.

**COUNT SEVEN**
**Defamation and Defamation Per Se**
**(Against Defendant Edward Westfall individually)**

41

270.     Paragraphs 1-269 are realleged and incorporated by reference as if fully set forth herein.

271.     CAPT Westfall intentionally made false and defamatory statements regarding Dr. Alessa's conduct and actions, with the intent to harm Dr. Alessa.

272.     CAPT Westfall disseminated his false statements, both verbally and in writing to third parties, including without limitation, senior Navy officials, the DHS Inspector General and various other individuals within the intelligence community.

273.     Specifically, CAPT Westfall declared to senior Navy officials and/or the Inspector General that Dr. Alessa and her colleague Mr. Moon were engaged in an extra-marital affair.

274.      If it were true, the statements implied that such a relationship would also be a prohibited romantic relationship under Agency guidelines, a factually inaccurate statement.

275.     In addition, CAPT Westfall disseminated the following statements, both orally and in writing about Dr. Alessa:

a)     that Dr. Alessa had been fired for cause;

b)     she had her security clearance revoked;

c)      that she exaggerated her credentials; and

d)     that she was an insider threat.

276.     Between May 2019 and November 2019, CAPT Westfall repeated these false statements orally and/or in writing to the following individuals:

a)     Ms. Nicole Wells, a NIM-Transnational Crime, Homeland, and Western Hemisphere (NIM-THW) staff member;

b)     Ms. Kelly Parks, an ODNI Legislative Affairs staff member;

c)      Mr. Michael Shimoff, another NIM-THW staff member;

d)      Mr. Jason Wang, a National Security Agency staff member;

e)      Mr. Eric Downes, U.S. Coast Guard Intelligence;

f)      Mr. Michael Potts, U.S. Coast Guard Intelligence;

g)      Mr. Christopher Demi, U.S. Coast Guard Intelligence; and

h)      Lieutenant Commander Michael Bielby, of Canadian Defence Forces, among others.

277.    Several of these individuals further disseminated the falsehoods to others and throughout other federal government agencies, as a result of receiving the information from CAPT Westfall.

278.    CAPT Westfall intentionally made the statements with the intent to harm Dr. Alessa.

279.    CAPT Westfall's statement regarding an extra-marital affair is defamation *per se* and actionable as a matter of law irrespective of special harm.

280.    CAPT Westfall's statement was intended to injure Dr. Alessa in her profession and standing within the academic and intelligence community.

281.    Damages are presumed as a result of the statements being defamation *per se*.

282.    Notwithstanding, but in the alternative, CAPT Westfall's statements caused Dr. Alessa severe and special harm specifically with respect to her professional reputation within the academic and intelligence community and her ability to move her BDAADS program to another Agency within the federal government.

283.    Dr. Alessa has and will suffer severe harm in her ability to procure grants and other employment opportunities which are expected as part of her duties with the University of Idaho and

in addition to course curriculum.

284.    The spreading of the falsehoods against Dr. Alessa was so grave, and so damaging, that on September 8, 2019, the General Counsel of the University of Idaho, Mr. Nelson sent a letter to Mr. Levitz, General Counsel at ONI,  requesting that he inform the new Director of NMIO, RADM Aeschbach, USN, of the situation and that she direct the NMIO staff to cease spreading this misinformation and to reach out to those individuals and agencies who were recipients of the misinformation and make appropriate corrections. See Exhibit 3.

285.    Dr. Alessa is entitled to recover compensatory damages, which are presumed, and as a result of the damage to her reputation.

286.    In addition, Dr. Alessa is entitled to recover punitive damages due to the intentional, willful and reckless actions of CAPT Westfall.

## DEMAND FOR JURY TRIAL

Plaintiff hereby requests trial by jury for all claims herein.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests judgment as follows:

A.    Accept jurisdiction over this matter;

B.    Award Plaintiff her past and future loss of wages and benefits, plus interest, in an amount to be proven at trial, but not less than $1.5 million;

C.    Award Plaintiff compensatory damages for each claim, in an amount to be proven at trial, but not less than $1.5 million;

D.    Award Plaintiff back pay (including benefits);

E.    Award Plaintiff front pay (including benefits);

F.    Award Plaintiff reputational damages and presumed damages on her defamation claims, in an amount to be proven at trial, but not less than $3 million;

G.    Award Plaintiff punitive damages on her defamation claims;

H.    Award to Plaintiff all costs and reasonable attorneys' fees incurred in connection with this action;

I.      Require a formal, public, and written apology from the Navy outlining the terms of relief and the Navy's misconduct;

J.      Require the Navy to conduct additional EEO and personnel training for management; and

K.      Grant Plaintiff such additional or alternative relief as the Court deems just and proper.


Respectfully submitted,

DR. LILIAN ALESSA
By Counsel

_Kevin Byrnes_

Kevin E. Byrnes, D.C. Bar No. 480195
Samuel M. Adelmann, V.A. Bar No. 81786
FH+H, PLLC
1751 Pinnacle Drive, Suite 1000
Tysons, VA 22102
T: 703.590.1234
F: 703.590.0366
kbyrnes@fhhfirm.com
sadelmann@fhhfirm.com
E-File@fhhfirm.com
*Counsel for Plaintiff*